UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:23-cv-22322-KMW

BETTY'S BEST, INC.,

      Plaintiff,

v.

THE INDIVIDUALS, PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A",

      Defendants.

**PLAINTIFF'S REPLY MEMORANDUM OF LAW TO THE 64 DEFENDANTS' OPPOSITION (ECF 121) TO MOTION FOR PRELIMINARY INJUNCTION**

**I.  INTRODUCTION**

The 64 Defendants are a small group of related Chinese entities. (See Corporate Disclosure Statements filed at ECF 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 109, 110, 111, 112, 113, 114, 115, and 117). The 64 Defendants operate the websites listed on Schedule A that match up to their defendant numbers. The 64 Defendants' websites are all scam websites.[1]

Plaintiff began investigating the 64 Defendants in August of 2021 when Facebook ads using plaintiff's intellectual property promoting the sale of counterfeit goods appeared online. The Facebook ads linked potential purchasers to the 64 Defendants' scam websites where "too good to be true" offers of knockoff products that violated plaintiffs' and others' intellectual property rights were sold at bargain basement prices.

All the evidence Betty's Best developed in its pre-suit investigation pointed to the 64 Defendants all being participants in a single illegal counterfeiting enterprise based in China

---

[1] The FTC defines a "scam website" as one that engages in one or more illegal business practice such as the sale of counterfeit goods, false or deceptive advertising, the use of fake reviews, misrepresentation, or other practices declared illegal under Section 5 of the FTC Act. See, e.g., Scam Watch | Federal Trade Commission (ftc.gov), and Scams | Consumer Advice (ftc.gov).

1

targeting U.S. consumers. Since this case was filed, and since the defendants were identified as Chinese entities, more evidence of their counterfeiting and fraud was collected. Based on this additional evidence, plaintiff moved to amend its complaint to allege defendants are engaged in a racketeering conspiracy to defraud consumers and commit criminal copyright and trademark infringement. (ECF 120, 120-001). Plaintiff seeks the imposition of a constructive trust over the 64 Defendants' ill-gotten gains, the same funds frozen by this Court in its TRO.

The 64 Defendants' opposition to plaintiff's motion for preliminary injunction admits to counterfeiting. The 64 Defendants provided the Court with a chart. (ECF 121-1). The chart admits tens of thousands of dollars in sales of counterfeit goods in the U.S. violating Betty's Best's IP rights.[2] The 64 Defendants' also proffer declarations of five controlling persons that admit defendants' chart "accurately includes correct [counterfeit goods] sales information for these Defendants and their websites [listed on Schedule A]." (ECF 121-2 through 121-6). In their defense, the 64 Defendants' representatives claim they did not know "that any photographs or other alleged intellectual property rights at issue in this Lawsuit were copyrighted or otherwise protected." (ECF 121-2 at 4, ECF 121-3 at 4, ECF 121-4 at 4, ECF 121-5 at 4, ECF 121-6 at 4).

As a result of these admissions, the element of a substantial likelihood of success on the merits of the claims is established here. The remainder of the defendants' arguments challenging likelihood of success are (1) lack of personal jurisdiction, (2) invalid service, (3) that plaintiff's claims are "meritless," and the complaint contains shotgun pleading. These are easily dealt with:

(1) As to personal jurisdiction, the law permits plaintiff to rely upon the allegations in its complaint which *prima facie* demonstrate proper specific personal jurisdiction. Once a defendant comes forward with evidence indicating that personal jurisdiction is lacking, plaintiff may test the veracity of the 64 Defendants' denials in jurisdictional discovery. Refusal of a preliminary injunction is improper where, as here, the evidence establishes a reasonable probability of plaintiff's ultimate success on the question of jurisdiction.

(2) As to service, this Court granted plaintiff's motion for alternate service, plaintiff

---

[2] Discovery will reveal whether the 64 Defendants are being truthful with their sales numbers or not. Plaintiff believes they are not being truthful. Moreover, plaintiff believes that the 64 Defendants are part of an even larger group of scam website operators not named here that have yet to be identified and that work with the 64 Defendants to sell Chinese counterfeit goods.

        complied with this Court's order, and the 64 Defendants have failed to move to quash service or vacate the Court's order permitting service by email and website posting upon them. The Court's order was followed and the Defendants' arguments concerning the views of a minority of outlier district court judges in other districts as to the interpretation of China's objections to the Hague Convention are not a basis to refuse the injunction requested.

(3) Plaintiff's claims are not meritless. This Court already reviewed plaintiff's evidence supporting those claims in sworn affidavits attaching plaintiff's intellectual property registrations and thousands of pages of screenshots showing infringing goods. That review justified the issuance of a TRO. The 64 Defendants' unsupported assertions of invalidity and misplaced complaints about shotgun pleading should be disregarded.

But ultimately the 64 Defendants' opposition is really all about the asset freeze because defendants "utilize PayPal accounts to operate their business" and that the "PayPal accounts are essential to Defendants' business operations." Defendants attached five affidavits that assert—in conclusory fashion and in identical language—that they "are suffering extreme harm from the freezing of their Pay Pal accounts," and that "[a]ll or virtually of the frozen assets of these Defendants are proceeds from sales of products that are entirely unrelated to the product at issue." All the affidavits claim—without a single shred of supporting evidence whatsoever—that

> [b]ecause of the vastly overbroad asset restraint, these Defendants are at risk of being held liable for defaulting on other obligations. Moreover, these Defendants are suffering an incalculable loss of reputation in the market. The Defendants have invested significant amounts of effort and money to establish themselves in the marketplace, and their inability to continue operating their businesses through their now frozen PayPal accounts is causing an immeasurable loss of corporate reputation and difficulty in managing business operations.

(ECF 121-2 at 4-5, ECF 121-3 at 4-5, ECF 121-4 at 4-5, ECF 121-5 at 4-5, ECF 121-6 at 4-5).

These conclusory assertions fail to meet the defendants' burden. The burden is on the 64 Defendants—admitted counterfeiters—to demonstrate that their frozen funds are not the proceeds of counterfeiting. *See Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 910 (N.D. Ill. 2015) ("To exempt assets from an asset freeze, '[t]he burden is on the party seeking relief to present documentary proof that particular assets [are] not the proceeds of counterfeiting activities.'") quoting *Luxottica USA LLC v. The Partnerships, et al.,* No. 1:14-cv-09061, 2015

3

U.S. Dist. LEXIS 78961, 2015 WL 3818622 (N.D. Ill. June 18, 2015) citing *N. Face Apparel Corp. v. TC Fashions, Inc.,* No. 05 CIV. 9083(RMB), 2006 U.S. Dist. LEXIS 14226, 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006)); *see also Antsy Labs, LLC v. Individuals*, No. 21 C 3289, 2022 U.S. Dist. LEXIS 212406 (N.D. Ill. Nov. 23, 2022) (same).

      No evidence that the defendants' PayPal funds are not the proceeds of counterfeiting has been offered. No account transactions, no logs, no ledgers; nothing showing the defendants are not in the business of counterfeiting. Instead, defendants fall back on conclusory claims of immeasurable loss and damage to reputation without any backup whatsoever. The reason is obvious: the defendants have no evidence to show they engage in lawful commerce, and without that evidence the freeze must remain in place. *See Monster Energy*, 136 F. Supp. 3d at 910 (refusing to lift an asset freeze because the "The defendants have not submitted any evidence regarding their PayPal account transactions to show that these funds are not the proceeds of counterfeiting activities.")

      The harm the 64 Defendants are suffering is the result of the discovery of their criminal enterprise. Their PayPal accounts were frozen because defendants use those accounts as instrumentalities of their counterfeiting enterprise. The asset freeze avoids further irreparable harm to plaintiff and protects the equitable rights of plaintiff and other victims of the defendants' scams.

      The remainder of the 64 Defendants' opposition is pure distraction. Yes, plaintiff filed a case initially in the Western District of Texas.[3] The defendants were different in that case. The district judge *sua sponte* transferred that case to the Central District of California before ruling on plaintiff's motion for preliminary injunction.[4] The district judge in the CDCA requested an amended complaint be filed, and after plaintiff filed that complaint the district judge raised other procedural issues.[5] At that point Plaintiff made the decision, as was its right under Rule 41(a), to dismiss the case in order to continue its investigation into the counterfeiting and the defendants' enterprise. None of this was "hidden" or "withheld" from this Court or the defendants as the case never progressed to the point of service and no substantive decisions one way or the other were

---

[3] *Betty's Best, Inc. v. Yuyao Aggpo Electronic Technology Co. LTD, et al*, Case No. 1:22-cv-010708-RP.

[4] ECF 10.

[5] Case No. 2:22-cv-09096-MCS-JPR, ECF 41, 43, 44.

entered on the merits.

Rather than immediately refile, plaintiff refocused its efforts on its investigation, especially the Facebook advertising infringement involving the 64 Defendants. Plaintiff also tried to identify the source of the counterfeit goods and the defendants' identities. Since Betty's Best manufactures all its products in the U.S., it was clear that the problem was coming from China. Unlike law enforcement, plaintiff lacks subpoena power pre-suit. Without a subpoena, plaintiff could not obtain evidence from third parties without their cooperation and agreement. So when plaintiff's investigation reached the point where it had all the evidence it could get without the aid of legal process, Betty's Best refiled this case in the Southern District of Florida.

After this Court granted the plaintiff's motion for TRO and asset freeze, plaintiff's investigation continued. Plaintiff intends to file motions for early third-party discovery under Rule 26(d), and for discovery of the 64 Defendants on personal jurisdiction.

II. **ADDITIONAL FACTUAL SUPPORT FOR THE PRELIMINARY INJUNCTION**

Sunday Jacobs, the Chief Operating Officer of Betty's Best, submits her declaration in further support of the motion for preliminary injunction, and in response to the 64 Defendants' opposition. Relevant to this motion, Ms. Jacobs affirms that:

- Betty's Best conducts a significant amount of business in Florida from horse and pet owners and enthusiasts; that Betty's Best has sold thousands of dollars of their products in Florida; and that Betty's Best's sales to the state have been decimated by the 64 Defendants' unlawful actions, and especially by their use of Betty's Best's highest sales converting copyrighted marketing videos and photographs in their advertisements for their counterfeit products and on their websites where they sold counterfeit products. (Jacobs Decl. ¶¶ 51-52).
- Betty's Best has discovered other counterfeiting by the 64 Defendants of other IP owners in the course of its investigation and attached to Ms. Jacobs' declaration are screenshots showing counterfeiting other IP owners' intellectual property. (Jacobs Decl. ¶ 26).
- Betty's Best compiled screenshots showing consumer reports on the 64 Defendants' businesses and their websites demonstrating that defendants are running scam websites engaged in online internet scams. (Jacobs Decl. 26).

- Betty's Best complied consumer reports of scams made directly to Betty's Best about the 64 Defendants and their counterfeiting and online scam business. (Jacobs Decl. 26).

### III.    ARGUMENT

**A. Plaintiff Demonstrated a Reasonable Probability of Ultimate Success on Personal Jurisdiction**

The non-conclusory allegations contained in the complaint and motion for preliminary injunction demonstrate a prima facie case of specific personal jurisdiction in Florida under § 48.193.(1)(a)(2), Florida Stat., which authorizes jurisdiction over "[a]ny person…who personally or through an agent…[commits] a tortious act within this state." *Id*. Violations of copyright and trademark rights qualify as tortious acts under Florida's long-arm statute. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013) (trademark infringement claims qualify as tortious acts); *Precision Software Servs., Inc. v. Fortune Fin. Sys., Inc.,* CASE NO. 98-136-CIV-FTM-17D, 1998 U.S. Dist. LEXIS 22068, at *11 (M.D. Fla. Oct. 13, 1998) citing *Cable/Home Commun. Corp. v. Network Prods.,* 902 F.2d 829, 856 (11th Cir. 1990) (copyright infringement is a tort).

The allegations of the Complaint satisfy plaintiff's specific jurisdictional burden under *Valle v. Trivago GmbH*, where the Eleventh Circuit held that allegations strikingly similar to those in the Complaint in this case were sufficient to satisfy the plaintiff's burden to allege specific jurisdiction under § 48.193(1)(a)(2). 56 F.4th 1265, 1274 (11th Cir. 2022). Relying on *Internet Solutions Corp. v. Marshall,* 39 So.3d 1201, 1216 (Fla. 2010), and *Louis Vuitton*, 736 F.3d at 1353, the Eleventh Circuit determined that allegations that the defendant sold trademark-infringing goods and services to Florida residents through the defendant's website, and that when the infringing products were sold and shipped to Florida they caused injury to the plaintiff in Florida, satisfied specific personal jurisdiction under § 48.193(1)(a)(2) because the defendant's tortious acts engaged Florida residents and were committed on a website that was accessible to Florida residents. *Trivago*, 56 F.4th at 1274.

Defendants argue that a "website must sell a 'significant' quantity of goods to people in the forum." (ECF 121 at 7). There is no such "significant quantity" requirement. Personal jurisdiction is established where defendant's "trademark infringing goods were not only accessible on the [defendant's] website, but were sold to Florida customers through that

website." *Louis Vuitton*, 736 F.3d at 1354. Defendants' affidavits and chart admit to sales to Florida residents. This is sufficient *prima facie* for personal jurisdiction.

Defendants' also mistakenly rely on *BTG Pat. Holdings, LLC v. Bag2Go, GmbH,* 193 F. Supp. 3d 1310, 1314 (S.D. Fla. 2016). In that case the defendant never sold infringing products within the state of Florida, let alone in the United States. Defendant also cites to a California case, *Pado, Inc. v. Wieder & Friedman Enter. Inc.,* No. CV2004278CJCPVCX, 2020 WL 13368480, at *3 (C.D. Cal. July 9, 2020), for the proposition that "sales to test purchasers do not suffice to establish personal jurisdiction." However, there is no such rule in Florida or the Eleventh Circuit.

The prevailing authority supports the exercise of specific personal jurisdiction besed on either the sale of infringing goods or services via a website to the state's residents as in *Trivago*, or the mere offering to sell infringing goods in the state as in *NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 624 (7th Cir. 2022), cert. denied, 143 S. Ct. 577 (2023) (determining that an online offer to sell infrining goods to the plaintiff's agent was sufficient to support specific personal jurisdiction). Here, defendants admit even before jursditional discovery that they sold 39 counterfeit goods to consumers in the state of Florida. That admission indicates that plaintiff has more than a reasonable probablity of success in establishing personal jurisdiction over the 64 Defendants.

**B.    Defendants Cannot Challenge Service that Complied in all Respects with this Court's Alternate Service Order in Opposition to the Motion for Preliminary Injunction; Defendants Should Move to Quash Service**

The 64 Defendants go on at length arguing that they were never validly served. However, half of the 64 Defendants were served validly and in accordance with this Court's order entered at ECF 21.[6]  Those defendants received notice and appeared here through counsel, and can move to quash service or dismiss. However, plaintiff cannot be denied a preliminary injunction based on presumptively valid service effectuated in accordance with this Court's order. As for the other defendants, their appearance and participation here through their U.S. counsel is a strong indication that they have received notice of the lawsuit. Courts have often found that service on a foreign defendant's U.S. counsel is reasonably calculated to apprise the defendant of the lawsuit. See, e.g., *Hawthorne Indus. Prods. v. M/V TAC Imola*, No. RDB-22-1376, 2023 U.S. Dist.

---

[6] ECF 54, 56, 57, 59, 61, 64.

LEXIS 2551, at *5 (D. Md. Jan. 5, 2023).

The 64 Defendants accuse plaintiff of concealment. Plaintiff concealed nothing. The minute order issued by the district court for the Central District of California denied plaintiff's motion for alternate service without prejudice after the prior case was transferred there from the Western District of Texas. The court denied the motion because it believed that certain information about the specific countries where defendants reside *besides China* was missing. In the process, the court noted—directly contrary to the 64 Defendants' argument--that service by email on defendants in China *has been approved by many courts,* including in the Central District of California:

> Plaintiff proffers that China's reservation to the Convention does not preclude service by electronic means. (EPA 14.) Many courts in this district concur. E.g., [*Victaulic Co. v. Allied Rubber & Gasket Co., Inc*., No. 3:17-cv-01006-BEN-JLB, 2020 U.S. Dist. LEXIS 82150, at *7 (S.D. Cal. May 8, 2020) (citing Hague Convention art. 10).] at *7–8 (collecting cases); *Likas v. ChinaCache Int'l Holdings, Ltd*., No. CV 19-6942 FMO (SSx), 2020 U.S. Dist. LEXIS 90923, at *6–7 (C.D. Cal. Jan. 29, 2020) (same).

(ECF 43 filed in CDCA case, attached hereto as Exhibit 1).

While it is true that a small minority of district courts *outside* this district have opined that China's reservation to the Hague Convention does preclude email service, no court in this district agrees with that conclusion, and no other district courts in the Eleventh Circuit do either. The 64 Defendants provide no binding authority supporting their arguments, and cannot do so.

The principal authority the 64 Defendants rely upon is *Smart Study Co. v. Acuteye-Us*, 620 F. Supp. 3d 1382 (S.D.N.Y. July 21, 2022), but *Smart Study* is an outlier. Smart Study was decided based on that district court's belief that China's "objection to service by postal channels includes an *implicit* objection to service by email," and that based upon that *implicit* objection China "would preclude service by email under the Hague Convention." *Smart Study,* 620 F. Supp. 3d at 1395. In other words, China has never expressly objected to email service, but if given the chance to object, the district court in *Smart Study* believed that China would object.

Over a year has passed since the decision in *Smart Study*, yet no explicit Hague objection to email service from China has materialized. This Court's concerns need not be theoretical. If defendants want to convince the Court that service upon them was improperly permitted by alternate means they can move to quash or otherwise set aside this Court's order granting alternate service. If they do, then the issue can be briefed at that time. Meanwhile, due process

8

concerns related to the pending motion for preliminary injunction are certainly absent in view of counsel's appearance for the 64 Defendants on this motion.

### C. The 64 Defendants' Shotgun Pleading Complaints are Irrelevant to the Motion for Preliminary Injunction, and their IP Invalidity Claims are Conclusory and Unsupported

"Shotgun allegations" are those which fail to link each cause of action to its factual predicates, *Ward v. JP Morgan Chase Bank*, No. 13-61554-CIV, 2014 WL 197720, at *2 (S.D. Fla. Jan. 15, 2014) (citing *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001)). This is a motion for preliminary injunction. The allegations in the complaint are supported by fact. The facts are not controverted by the defendants. The court reviewed the evidence and granted the TRO motion. The defendants' arguments about shotgun pleading are without merit.

The 64 Defendants' arguments concerning the validity of plaintiff's intellectual property are unsupported and improper. Plaintiff's trademarks are registered, entitled to a presumption of validity, and incontestable. 15 U.S. Code § 1115(a). Plaintiff's copyrights are registered and entitled to a presumption of validity. 17 U.S. Code § 410(c). Plaintiff's design patent was duly issued after examination and presumptively valid. 35 U.S.C. § 282(a). The 64 Defendants' conclusory assertions cannot overcome the evidence of registration for these rights.

### D. The 64 Defendants Utterly Failed to Meet their Burden and the Asset Freeze Should Remain in Place in Full

"To exempt assets from an asset freeze, the burden is on the party seeking relief to present documentary proof that particular assets are not the proceeds of counterfeiting activities." *Antsy Labs, LLC v. Individuals*, No. 21 C 3289, 2022 U.S. Dist. LEXIS 212406, at *12 (N.D. Ill. Nov. 23, 2022) citing *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 910 (N.D. Ill. 2015). A plaintiff's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains [is required] . . . Exactitude is not a requirement." -*Acoustics v. Se7Ven Sounds Music, Inc.*, No. 8:22-cv-2823-MSS-AAS, 2023 U.S. Dist. LEXIS 67070 (M.D. Fla. Mar. 28, 2023). It is well recognized that it is often impossible to calculate disgorgement with precision and exactitude. *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 171 (2d Cir.1980). Any risk of uncertainty about exact amount received falls on the wrongdoer whose illegal conduct created the uncertainty. *See SEC v. Inorganic Recycling Corp.,* 2002 WL 1968341 (S.D.N.Y.2002) (stating that the risk of uncertainty falls on defendants since fraudsters rarely keep accurate

records of the proceeds of their crimes); *S.E.C. v. Lauer*, 445 F. Supp. 2d 1362, 1370 (S.D. Fla. 2006).

Other courts faced with precisely the same situation—defendants who seek a reduction in asset restraints but fail to offer documentatary evidence to meet their burden to show that the assets frozen are not the proceeds of counterfeiting—have refused to reduce PayPal account restraints because Defendants failed to submit any evidence regarding their PayPal account transactions to show that these funds are not the proceeds of counterfeiting activities. See *Luxottica USA LLC v. The Partnerships, et al.*, No. 1:14-cv-09061, 2015 U.S. Dist. LEXIS 78961, 2015 WL 3818622 (N.D. Ill. June 18, 2015) (citing *N. Face Apparel Corp. v. TC Fashions, Inc.*, No. 05 CIV. 9083(RMB), 2006 U.S. Dist. LEXIS 14226, 2006 WL 838993, at *3 (S.D.N.Y. Mar. 30, 2006)).

These defendants offer no evidence to support their claims that the funds are not the proceeds of counterfeiting. Indeed, the exhibits to the declaration of Sunday Jacobs showing that the defendants operate scam websites and counterfeiting of others intellectual property, engage in fraud and engage in false advertising and deceptive practices indicate that the freeze should be maintained and that the frozen assets are derived from counterfeiting.

E.  **The Amount of Bond is Discretionary with the Court and a Reasonable Bond Increased to $50,000 is Sufficient to Protect Defendants**

"The burden of establishing a rational basis for the amount of a proposed bond rests with the party seeking security." *Continental Grp., Inc. v. KW Property Mgmt., LLC*, No. 09-60202-CIV, 2009 WL 3644475, at *6 (S.D. Fla. Oct. 30, 2009). "The amount of an injunction bond is [a matter ultimately] within the sound discretion of the district court." *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.,* 112 F.3d 1125, 1127 (11th Cir. 1997); Fed. R. Civ. P. 65(c).. Indeed, "the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005).

Defendants assert, without any evidentiary support whatsoever, that 64 Defendants are suffering "ongoing irreparable harm to Defendants' businesses." (ECF 121 at 17). Defendants have the burden to show a rational basis for the bond amount. Conclusory assertions fail to provide such support. There is no rational basis to impose a bond unless defendants are prepared to demonstrate why they are suffering harm from loss of legitimate business, as opposed to illegitimate and illegal counterfeiting.

IV.  CONCLUSION

In view of the foregoing, Plaintiff respectfully requests this Court grant Plaintiff's Motion for a Preliminary Injunction as to the 64 Defendants.

DATED:  October 13, 2023                    Respectfully submitted,


/s/ Joel B. Rothman

JOEL B. ROTHMAN
Florida Bar Number:  98220
joel.rothman@sriplaw.com
ANGELA M. NIEVES
Florida Bar Number:  1032760
angela.nieves@sriplaw.com

**SRIPLAW, P.A.**

21301 Powerline Road
Suite 100
Boca Raton, FL  33433
561.404.4350 – Telephone
561.404.4353 – Facsimile

*Counsel for Plaintiff Betty's Best, Inc.*