**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 1:23-cv-22322-KMW**

BETTY'S BEST, INC.,

        Plaintiff,

v.

THE INDIVIDUALS, PARTNERSHIPS,
AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON
SCHEDULE "A",

        Defendants.

---

**<u>DECLARATION OF SUNDAY JACOBS</u>**

I, Sunday Jacobs, declare and say:

1.      I am over 18 years of age, and I have personal knowledge of the facts set forth herein.

2.      If called upon to do so, I could and would competently testify to the following facts set forth below.

3.      I am Chief Operating Officer of BETTY'S BEST, INC. ("Betty's Best" or "Plaintiff").

4.      Betty's Best incorporated on January 1, 2016, and has been in continuous operation since then.

5.      Betty's Best is the maker of the StripHair Gentle Groomer, a therapeutic brush for horses and dogs.

6.      Betty's Best's products are sold through hundreds of authorized retailers and distributors in the United States and many countries like Canada, United Kingdom, Australia, South Africa, Japan, and numerous countries across Europe, listed on the StripHair.com Store

Locator Map at https://striphair.com/pages/retail-store-locator, its own website
https://striphair.com/collections/all-products, Amazon.com and other authorized retailers, these
last in marketplaces other than Amazon.com and eBay.com.

7.       Betty's Best owns the trademarks, copyrights and design patent described in the
Declaration of Sarah Owen filed in this action. I have read the declaration of Sarah Owen and it
is true and correct. I adopt the abbreviations used for plaintiff's intellectual property in the
Declaration of Ms. Owen here.

> A.       *Background on Betty's Best's Facebook Advertising*

8.       Betty's Best's product the StripHair Gentle Groomer became a viral sensation as
soon as it was introduced using demonstration videos by owner Sarah Owen that demonstrated
the product's effectiveness as a therapeutic brush for horses, dogs and cats.

9.       From its founding through the start of the pandemic in 2020, Betty's Best's
StripHair Gentle Groomer steadily grew into a multi-million dollar per year selling product
largely based on social media promotion and advertising.

10.       Betty's Best has been an active advertiser on Facebook since the company began.

11.       To run a Facebook Ad, the advertiser first needs to create a target audience "based
on the traits of who you want to see your ad, and narrow down your ad's audience by interests,
gender or location and use ad targeting to find the people most likely to take action." Facebook
recommends a target audience size of between two and ten million people. Once the ad starts
running, Facebook's system "will learn who is engaging with it and, over time, narrow your
audience so you reach more of the right people."

12.       The advertiser then must set a budget amount that they are willing to spend on
running their ads. According to Facebook you first decide how much you want to spend on
advertising, and then "Meta tries to get you as many results as possible for that amount. If you
want to spend $5 a week, you can. If you want to spend $50,000 a week, you can do that too."

13.       The fee charged by Facebook for ads is based on the number of impressions and
performance of the ad, and the advertiser is charged for the number of clicks or impressions the

ad received. The total number of clicks or impressions an ad receives is shown in the advertiser's Ads Manager page.

14.     Betty's Best was an extremely successful user of Facebook advertising which proved to be an effective generator of sales for Betty's Best because of the way in which Facebook ads can be targeted.

15.     While the pandemic slowed the trajectory of Betty's Best's growth, the company was on target to grow by significant multiples of its prior success in 2021 after the pandemic business interruptions subsided.

16.     However, starting in mid-2021, Betty's Best's resurgence and growth as a business was interrupted again by the 64 Defendants' illegal scheme.

*B.     Betty's Best's Investigation*

17.     In August of 2021, Betty's Best's employees discovered the counterfeiting of its intellectual property in advertising on Facebook with links to Chinese scam websites selling counterfeit versions of its products.

18.     Betty's Best investigated the promotion and sale of counterfeit and infringing products and determined that the 64 Defendants were responsible.

19.     Working with a team of internet investigators, over the past two years Betty's Best has performed an extensive investigation of counterfeiting of our products. Our investigation included the 64 Defendants who filed their opposition to plaintiff's motion for a preliminary injunction at ECF No. 121.

20.     The 64 Defendants used Betty's Best's highest-performing marketing videos, high quality copyrighted marketing photographs, and copyrighted text from the Betty's Best website in their advertising as well as on the landing pages to their websites that are linked from the ads in order to deceive unsuspecting consumers into thinking they were purchasing genuine Betty's Best product instead of the Defendants' cheap counterfeit goods.

21.     The 64 Defendants used Facebook advertising to drive purchasers to their websites.

22.     The 64 Defendants' social media accounts and pages functioned to link potential victims of the defendants' scams to their websites.

23.     The 64 Defendants used the following false advertising techniques in their online social media advertising:

    a.  **Intellectual Property Infringement**: Unauthorized copies of the Betty's Best Marks, the copyrighted Works and the HOPGT Design Patent are used pervasively in the 64 Defendants' advertisements.

    b.  **Misleading Headlines or Titles**: The 64 Defendants promise results or benefits that are not delivered by the product or service.

    c.  **Unsupported Claims**: The 64 Defendants make grand claims without any scientific evidence or factual basis.

    d.  **Fake Testimonials**: The 64 Defendants sites feature fabricated testimonials or reviews, including stock photos or generic names, with raving reviews about the product or service.

    e.  **Ambiguous Language**: The 64 Defendants' use vague terms or phrases that sound scientific but don't really mean anything, like "revolutionary formula" or "advanced technology."

    f.  **Time Pressure**: The 64 Defendants sites claim that an incredible deal is about to expire to create urgency. Phrases like "limited-time offer" or "only a few left in stock" push visitors to buy without doing proper research.

    g.  **Counterfeit Goods**: The 64 Defendants websites advertise genuine brand-name products but sends knockoffs or counterfeits to buyers.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

h. **Mismatch Between Advertised and Sold Products**: The 64 Defendants websites display products of high quality or a well-known brand but send a cheaper, unrelated product to the buyer.

i. **Low-Quality or Stock Images**: The 64 Defendants websites do not have genuine images of the product, leading them to use unrelated stock images or low-quality photos.

j. **Price Ambiguity**: The 64 Defendants websites do not show the actual cost of the product but focus on phrases like "90% off" without clarifying the original or final price.

24.     I have visited the 64 Defendants' social media accounts and pages linked to the Facebook advertisements attached as Exhibit 1 to the declaration of Sarah Owen. Those accounts and pages are designed to deceive users in order to perpetrate and promote the defendants' fraudulent schemes and possess one or more of the following characteristics:

a. **Incomplete or Newly Created Profile Information**: A newly created profile or a profile with incomplete information can be a red flag. This includes a lack of personal bio, missing profile picture, or the use of a generic or stock photo as the profile image. That is the case with many of the 64 Defendants.

b. **High Follower-to-Following Ratio**: If an account has a large number of followers but follows a vast number of accounts in return (especially in a short time), it could indicate automated behavior or buying followers. That is the case with many of the 64 Defendants.

c. **Inconsistencies in Posts**: Content that doesn't align with the purported theme or persona of the account, frequent sharing of unrelated or random links, or erratic

posting behavior might be suspicious. That is the case with many of the 64 Defendants.

d. **Too-Good-to-Be-True Offers**: Posts or messages that offer incredible deals, giveaways, or opportunities often with the condition of sharing the post, providing personal information, or clicking on a specific link. That is the case with many of the 64 Defendants.

e. **Generic Content**: An abundance of shared generic content, inspirational quotes, or random images, with little to no original content or personal posts. That is the case with many of the 64 Defendants.

f. **Engagement Patterns**: Comments, likes, or shares that seem automated or irrelevant to the post. For instance, multiple accounts posting the same comment can be a sign. That is the case with many of the 64 Defendants.

g. **Strange Usernames**: Usernames that have a mix of random characters, numbers, or those mimicking real accounts with slight variations. That is the case with many of the 64 Defendants.

h. **Language and Grammar**: Poor grammar, odd phrasing, or excessive use of emojis and symbols can be indicative. That is the case with many of the 64 Defendants.

25.    I am familiar with the businesses of the 64 Defendants in that I have visited their websites where they engaged in counterfeiting of Betty's Best's intellectual property.

26.    Attached hereto are true and correct copies of the following documents compiled in the course of our investigation on these 64 Defendants.

| Exhibit Number | Description |
|---|---|
| 1 | Screenshots showing counterfeiting by the 64 Defendants of Betty's Best's intellectual property on the 64 Defendants' websites |
| 2A | Screenshots showing counterfeiting by the 64 Defendants of other IP owners' intellectual property |
| 2B | Chart showing the 64 Defendants' infringement of other IP owners' intellectual property |
| 3 | Screenshots showing consumer reports on the 64 Defendants submitted to websites that collect information on online scammers |
| 4 | Screenshots showing scam reports about the 64 Defendants on websites that collect information about online scammers |
| 5 | Consumer reports of scams made directly to Betty's Best for the 64 Defendants |

27.     A team of investigators worked with Betty's Best. I and our team reviewed the 64 Defendants' websites, advertisements, and other online resources concerning fraud in order to investigate the Defendants' counterfeiting and other criminal activities.

28.     The 64 Defendants operate scam websites that sell counterfeit goods including counterfeits of Betty's Best's products that violate our intellectual property rights. I observed the 64 Defendants engaging in one or more of the following fraudulent and deceptive acts or practices on their websites as shown in Exhibit 1:

    a.  **Counterfeiting:** Websites that offer counterfeit goods and infringing versions of goods including goods featuring unauthorized copies of the Betty's Best Marks, the copyrighted Works and the HOPGT Design Patent.

    b.  **False Advertising**: This includes making false or misleading statements in advertisements.

    c.  **Misrepresentation**: Websites that use photos or descriptions that do not accurately represent the product or service they are selling.

29.     All the 64 Defendants' websites feature one or more of the following characteristics of a scam website:

a. **Intellectual Property Infringement**: Unauthorized copies of the Betty's Best Marks, the copyrighted Works and the HOPGT Design Patent are used pervasively in the defendants' websites.

b. **Suspicious Domain Names**: The defendants' websites use domain names that are slight variations of well-known brands or include a mix of unrelated words.

c. **Poor Design and Grammar**: The defendants' websites have noticeable spelling and grammar mistakes, low-quality images, or a disorganized layout.

d. **Too-Good-To-Be-True Offers**: The defendants' websites offer unrealistically low prices or offers that seem too good to be true.

e. **Vague or Missing Contact Information**: The defendants' websites lack legitimate ways to be contacted.

f. **Unclear Return and Privacy Policies**: The defendants' websites lack clear policies about returns, data handling, and other customer-related matters.

g. **Poor Reviews or No Reviews**: The defendants' websites appear with poor user reviews or complaints about them on sites like Trustpilot or the Better Business Bureau.

h. **Insecure Connection**: Some of the defendants' websites lack HTTPS or prompt a browser warning about the certificate.

30.     Beginning in August of 2021 and through and including the present, the 64 Defendants used sophisticated advertising practices and tools to generate multiple ads and multiple versions of ads using Betty's Best Marks, the copyrighted Works, and the HOPGT Design Patent to imitate the StripHair brand and deceive consumers to purchase counterfeit products from the Schedule B scam websites.

31.     Beginning in August of 2021 and through and including the present, Betty's Best discovered the 64 Defendants promoting and otherwise advertising, selling, offering for sale, and distributing counterfeit goods bearing and/or using counterfeits of one or more of the Betty's Best Marks and the copyrighted Works.

32.     Beginning in August of 2021 and through and including the present, Betty's Best recorded and accumulated evidence of the 64 Defendants continuously infringing and inducing others to infringe one or more of the Betty's Best Marks and the copyrighted Works by using plaintiff's intellectual property to advertise, promote, sell, and offer to sell counterfeit and infringing goods on the 64 Defendants' scam websites.

33.     Betty's Best immediately complained to Facebook about the 64 Defendants' fraudulent advertising.

34.     Betty's Best exchanged emails with Facebook's intellectual property team and advertising team beginning in early September 2021 detailing plaintiff's serious concerns about the scam Facebook advertising activity engaged in by the 64 Defendants.

35.     Betty's Best recorded screenshots of the 64 Defendants' scam advertisements showing their uses of plaintiff's copyrights, design patent, and trademarks in the Facebook advertisements.

36.     Counterfeiting was found in advertising on Facebook that linked to the 64 Defendants' websites. Betty's Best observed the 64 Defendants using altered versions of Betty's Best photographs and product videos in paid sponsored advertisements within Facebook accounts with ad links directly to associated 64 Defendants' scam website pages with active shopping buttons that also showed uses of the Betty's Best Marks, the copyrighted Works and the HOPGT Design Patent.

37.     To date, Betty's Best has submitted over 3,512 IP Infringement Reports to Facebook for the fraudulent Facebook ads in an attempt to stop the 64 Defendants from using Facebook Ads to promote the sale of counterfeit Betty's Best products.

**SRIPLAW**

CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

38.     After obtaining a TRO in this action, Betty's Best analyzed some initial information received in response to the TRO and determined that the identities of the 64 Defendants overlap with each other.

39.     Betty's Best complained to Facebook and reported thousands of fraudulent Facebook advertisements placed by the 64 Defendants and memorialized those complaints in over 530 confirmatory emails that Betty's Best received from Facebook's reporting system for intellectual property infringement Facebook from August 2021 to August 2023. Each email concerns at least one advertisement, and sometimes multiple advertisements.

40.     Every consumer "click" of a link in the online and social media advertising was recorded and tracked by the online advertiser or social media platform and reported to the 64 Defendants.

41.     The 64 Defendants' scam websites observed by Betty's Best and collected in screenshots show that the websites of individual 64 Defendants are identical to or strikingly similar to the websites associated with other individual 64 Defendants.

42.     The 64 Defendants' Facebook advertisements collected by Betty's Best shows that the advertisements placed by individual 64 Defendants are identical to or strikingly similar to the Facebook advertisements placed by other individual 64 Defendants.

43.     The 64 Defendants' Facebook pages observed by Betty's Best shows that the Facebook pages of individual 64 Defendants are identical to or strikingly similar to the Facebook pages of other individual 64 Defendants.

44.     The test purchases of counterfeit products bought by Betty's Best shows that the counterfeit products sold by individual 64 Defendants are identical to or strikingly similar to the counterfeit products sold by other individual 64 Defendants.

45.     The test purchases of counterfeit products bought by Betty's Best from certain individual 64 Defendants were fulfilled and shipped by other individual 64 Defendants.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

46.     The counterfeit products sold by all the 64 Defendants were manufactured by the same or a small number of similar manufacturers.

47.     The packaging used for the counterfeit products sold by the 64 Defendants was the same or strikingly similar for all the counterfeit products sold by the 64 Defendants.

48.     The domain names for the 64 Defendants' scam websites are owned by the same or a small number of overlapping individuals or entities.

49.     The website hosting accounts for the 64 Defendants' scam websites are owned or operated by the same or a small number of overlapping individuals or entities.

50.     The 64 Defendants' unlawful actions have caused and are continuing to cause unquantifiable damages to Plaintiff and are unjustly enriching defendants with profits at Plaintiff's expense.

51.     Betty's Best conducts a significant amount of business in Florida. There are multiple communities of professional and recreational horseback riders throughout Florida, including well-known places like Wellington, Ocala/Marion County, and Southwest Ranches. Betty's Best has sold thousands of dollars of merchandise to these communities. In addition, the largest growing market for Betty's Best products in Florida is the pet care market. Nearly half of Florida households own at least one dog.

52.     Despite the robust pet care, equestrian, horse racing, polo, and recreational horseback riding markets in Florida, Betty's Best's sales to the state have been decimated by the 64 Defendants' unlawful actions, and especially by their use of Betty's Best's highest sales converting copyrighted marketing videos and photographs in their advertisements for their counterfeit products and on their websites where they sold counterfeit products.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK

Signed at <u>Graham</u>, <u>WA</u> on <u>10/13/2023</u>
            CITY     STATE     DATE

*Sunday Jacobs*

8cc3aeea822a4ac89528

Sunday Jacobs
Chief Operating Officer
Betty's Best, Inc.

**SRIPLAW**
CALIFORNIA ◆ GEORGIA ◆ FLORIDA ◆ TENNESSEE ◆ NEW YORK