**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 1:23-cv-22322-KMW**

BETTY'S BEST, INC.,

          Plaintiff,

v.

THE INDIVIDUALS, PARTNERSHIPS
AND UNINCORPORATED
ASSOCIATIONS IDENTIFIED ON
SCHEDULE "A",

          Defendants.

**REPORT AND RECOMMENDATION**
**GRANTING PRELIMINARY INJUNCTION AS TO THE 64 DEFENDANTS**

This matter is before the Court on Plaintiff Betty's Best, Inc.'s Motion for Entry of Preliminary Injunction as to Defendants numbered 720, 743, 769, 781, 831, 870, 906, 911, 912, 918, 924, 735, 767, 778, 773, 821, 832, 907, 913, 919, 775, 916, 704, 800, 714, 847, 754, 763, 785, 702, 914, 927, 786, 817, 825, 871, 798, 877, 840, 915, 772, 880, 917, 923, 713, 839, 715, 728, 765, 803, 909, 879, 780, 818, 819, 878, 883, 822, 910, 858, 888, 922, 891, 904 (the "64 Defendants"). [ECF No. 17]. The Court held a hearing on November 13, 2023 and heard argument of counsel. The Court has carefully considered the Motion, the Opposition [ECF No. 121], the Reply [ECF No. 130], the record, and the governing law. For the reasons stated below, it is **RECOMMENDED** that the Motion [ECF No. 17] be **GRANTED** as to the 64 Defendants and the asset freeze in the amount of $2 million remain in place.

**PROCEDURAL HISTORY**

Plaintiff originally moved for a Motion for Temporary Restraining Order ("TRO") and an order restraining transfer of assets and, upon for expiration of the TRO, a preliminary injunction

1

against defendants who had knowingly and intentionally promoted, advertised, distributed, offered for sale, and sold good bearing counterfeits and confusingly similar imitations of Plaintiff's registered trademarks, copyrights, and design patent within the Southern District of Florida and throughout the United States in e-commerce stores. [ECF No. 17]. The lawsuit included more than 1000 defendants. Plaintiff alleged that, because it will likely succeed on the merits of its claim, it is entitled to an accounting and payment of the profits earned by the defendants throughout the course of the counterfeiting scheme and that the Court should order the restraint of money found in the defendants' e-commerce accounts. [*Id.*]. Plaintiff is the maker of the StripHair Gentle Groomer, a therapeutic brush for horses and dogs, and owns the trademarks, copyrights and design patent for the products. [*Id.*].

The Undersigned recommended that the Motion for TRO and the asset restraint be granted on August 24, 2023. [ECF No. 22]. Judge Williams Affirmed and Adopted the Report and Recommendation on September 1, 2023. [ECF No. 24].  Plaintiff served the defendants in this case with the Summons, Complaint and the TRO. [ECF Nos. 43, 44, 46, 47, 49–52, 54, 56–67, 69–71, 83, 86].

On September 19, 2023, the 64 Defendants appeared through counsel and moved to continue deadlines and the hearing date on the Motion for Preliminary Injunction solely with respect to them. [ECF No. 40]. After a hearing, the Undersigned issued a Report and Recommendation that the hearing on the Motion for Preliminary Injunction be continued as to the 64 Defendants and that the TRO and asset restraint remain in place in the interim pending a hearing on October 18, 2023. [ECF No. 80]. On September 26, 2023, Judge Williams Affirmed and Adopted the Report and Recommendation. [ECF No. 87].

The 64 Defendants filed their Opposition to the Motion for Preliminary Injunction. [ECF No. 121]. In their Opposition, the 64 Defendants advised the Court that the TRO had restrained and frozen funds belonging to the 64 Defendants totaling over $21 million in their group of PayPal accounts. [ECF No. 121 at 4]. The 64 Defendants asserted that their sales of the relevant products were far lower and that they were "submit[ing] evidence confirming that such sales totaled $42,144 globally." [*Id.* at 4]. Plaintiff filed its Reply in support of its Motion for Preliminary Injunction. [ECF 130].

Plaintiff moved to conduct expedited discovery of the 64 Defendants. [ECF No. 166]. The 64 Defendants opposed the motion. [ECF No. 168]. Thereafter, the Undersigned denied the motion. [ECF No. 171].

On October 18, 2023, the Undersigned held a hearing on the TRO and heard argument from counsel concerning the asset restraint. [ECF No. 148]. Based upon the argument, and the representations of counsel for the 64 Defendants that their sales of allegedly infringing products totaled only $42,144, the Court recommended reducing the asset restraint to $2 million and increasing Plaintiff's bond to $500,000, to protect the 64 Defendants from a wrongful injunction or restraint, during the pendency of this action. [ECF No. 147].

Both Plaintiff and the 64 Defendants objected to the Report and Recommendation in part and as to the asset freeze reduction. The 64 Defendants argued that, because the "uncontroverted evidence in the record shows that the Defendants' sales of allegedly infringing products totaled only $42,144," the asset freeze should have been reduced further. [ECF No. 151 at 2]. Plaintiff argued the asset restraint should not have been reduced at all and further claimed the 64 Defendants sold infringing product of other companies, as well as Plaintiff's products. [ECF No. 150].

On November 7, 2023, Judge Williams Affirmed and Adopted the Report and Recommendation in all respects, and ordered that an evidentiary hearing as to the 64 Defendants on the Plaintiff's Motion for Preliminary Injunction be held on November 13, 2023 at 9:30 am before the Undersigned. [ECF No. 174]. Judge Williams also ordered that the TRO be extended as to the 64 Defendants until November 17, 2023 and ordered the parties to comply with all of the terms of the Report and Recommendation, including the filing of a bond in the amount of $500,000 by Plaintiff; that the 64 Defendants deposit the $2 million restrained into the attorney trust account of DGW Kramer LLP to be held there during the pendency of this matter; and that the 64 Defendants' PayPal accounts be released from any ongoing restraint thereafter. [ECF No. 174 at 3–4]. Plaintiff filed its $500,000 injunction bond on November 8, 2023. [ECF No. 180].

On November 7, 2023, the undersigned held a status conference where the parties were ordered to meet and confer concerning stipulating to issues of fact and law and to submit exhibit and witness lists in advance of the hearing scheduled for November 13, 2023. [ECF No. 175]. The parties exchanged exhibits and filed exhibit lists, witness lists, and trial briefs. [ECF Nos. 183–187, 189]. The parties also filed a stipulation in which they agreed to certain facts concerning the Plaintiff's intellectual property registrations and the admission of the exhibits for those registrations. [ECF No. 191].

On November 13, 2023, the Undersigned held an in-person hearing on Plaintiff's Motion for Preliminary Injunction. At the beginning of the hearing, counsel for the 64 Defendants orally moved to extend the TRO and continue the hearing for 14 days to permit the 64 Defendants to submit evidence of the 64 Defendants' sales of allegedly infringing products. [ECF No. 192]. Counsel for the 64 Defendants candidly admitted that the previous representation that sales of the relevant products by the 64 Defendants globally was only $42,144 was "inaccurate" and that the

4

sales amount were in fact higher, but had not yet been determined. The 64 Defendants required additional time to determine the correct amount of sales of accused products and sought a continuance. [ECF No. 192]. The Court denied the motion. [ECF No. 193].

Plaintiff called three witnesses:

1. Sarah M. Owen, the Chief Executive Officer of Betty's Best;

2. Amy McPeak, the Director of Operations of Edison, an intellectual property enforcement company; and

3. Sunday Jacobs, the Chief Operating Officer of Betty's Best.

Plaintiff offered exhibits that were accepted into evidence. [Plaintiff's Exhibits PX 1–PX 31, PX 33–PX 265, PX 267, PX 335, PX 337, and PX 342–344]. The 64 Defendants did not offer any exhibits or witnesses. Counsel for the parties offered argument and answered questions posed by the Court.

## I.    FINDINGS OF FACT

1. Plaintiff Betty's Best owns the following registered trademarks that are valid and incontestable: STRIPHAIR, Reg. No. 5,072,866 in class 021 for "Grooming tools for pets, namely, combs and brushes"; THE GENTLE GROOMER, Reg. No. 5,328,641 in class 021 for "Grooming tools for pets, namely, combs and brushes." [PX1, PX2].

2. Plaintiff Betty's Best owns a valid U.S. Design Patent No. D841,900 entitled "HORSE OR PET GROOMING TOOL." [PX3].

3. Plaintiff owns valid copyrights for the following works registered with the following registration numbers on the dates indicated (collectively, the "Works"):

| Copyright Title and Description | Reg. No. | Reg. Date | Exhibit |
|---|---|---|---|
| StripHair Product Pictures 2020 (group of 10 photographs) | VA 2-299-367 | 05/12/2022 | PX6, PX7 |

5

| Copyright Title and Description | Reg. No. | Reg. Date | Exhibit |
|---|---|---|---|
| StripHair Product Pictures 2019 (group of 7 photographs) | VA 2-300-902 | 05/19/2022 | PX8, PX9 |
| StripHair Product Pictures 2018 (group of 2 photographs) | VA 2-304-928 | 06/03/2022 | PX10, PX11 |
| StripHair Product Pictures 2021 (group of 8 photographs) | VA 2-304-931 | 06/03/2022 | PX12, PX13 |
| SH-Video-1 11.01.2019 (entire motion picture) | PAu 4-142-655 | 06/14/2022 | PX14, PX15 |
| SH-Video-2 4-01-2021 (entire motion picture) | PAu 4-142-666 | 06/14/2022 | PX16, PX17 |
| SH-Video-3 7.01.2021 (entire motion picture) | PAu 4-143-928 | 06/30/2022 | PX18, PX19 |
| SH-Video-4 4.01.2018 (entire motion picture) | PAu 4-143-929 | 06/30/2022 | PX20, PX21 |
| SH-Video-5 3.01.2019 (entire motion picture) | PAu 4-145-045 | 07/14/2022 | PX22, PX23 |
| SH-Video-7 6.01.2020 (entire motion picture) | PAu 4-145-360 | 07/19/2022 | PX24, PX25 |
| SH-Video-8 5.01.2021 (entire motion picture) | PAu 4-145-361 | 07/19/2022[1] | PX26, PX27 |
| SH-Video-6 2.01.2019 (entire motion picture) | PAu 4-145-379 | 07/19/2022 | PX28, PX29 |
| "striphair.com website" | VA 2-271-013 | 10/6/2021 | PX30, PX31 |

4.     Sarah M. Owen testified to her creation of the STRIPHAIR THE GENTLE GROOMER horse and pet grooming tool. Ms. Owen founded Betty's Best in 2015. The company has sold the STRIPHAIR THE GENTLE GROOMER since its invention and introduction. The company introduced the product on social media and achieved instant success. Ms. Owen described how the product became a "viral sensation" and achieved global recognition within the first year of its launch. The company manufactures its product in the U.S. only, based on a proprietary formula and design.

5.     Ms. Owen emphasized the importance of the company's trademarks and branding strategy based on those trademarks. The Court received product samples in evidence. A picture of Ms. Owen adorns the packaging for the STRIPHAIR THE GENTLE GROOMER brush for horses.

---

[1] The Parties' stipulation notes the year as 2021. [ECF No. 191 at 2]. However, this was likely typographical error as the copyright certificate lists the year as 2022. *See* PX 26.

[PX 342]. Ms. Owen testified that she is the "face" of the "Betty" persona used in all of Plaintiff's copyrighted marketing photos, videos, and website. Ms. Owen attributed the product's success to the use of this persona in the marketing materials.

6.      Ms. Owen testified that the company sells STRIPHAIR THE GENTLE GROOMER on its website, on Amazon.com, and through authorized retailers who agree to a Minimum Advertised Pricing program that maintains the retail price at $29.99. Ms. Owen also testified that the company advertised and marketed STRIPHAIR THE GENTLE GROOMER through Facebook and Instagram advertising which was highly effective due to the ability to target advertising by audience, demographics, interests, and location.

7.      Ms. Owen testified that in August of 2021, the Plaintiff first discovered unauthorized advertising on Facebook promoting the sale of copies of Plaintiff's STRIPHAIR THE GENTLE GROOMER product using Plaintiff's copyrighted photographs, videos, trademarks and design patent. The advertising linked viewers to websites online that also used Plaintiff's copyrighted photographs, videos, trademarks and design patent to sell the accused products. Ms. Owen testified that the company complained to Facebook, which removed the advertisements, but the advertisements were subsequently reposted.

8.      Ms. Owen testified that the accused products are of poor quality and are composed of unknown materials, in contrast to the STRIPHAIR THE GENTLE GROOMER product which is of high-quality materials and manufactured in the U.S. Ms. Owen testified that the accused products do not provide the performance benefits of the Plaintiff's STRIPHAIR THE GENTLE GROOMER product for horses or pets. Ms. Owen testified that the accused products were sold at heavily discounted prices of $9.99 or less. Ms. Owen testified that the sales of counterfeit products have devastated the company and destroyed its sales.

9.     The Court was able to observe the original STRIPHAIR THE GENTLE GROOMER products for horses [PX 342] and for pets [PX 343] admitted into evidence, and compare those to an exemplar of the accused products [PX 344] admitted into evidence for demonstrative purposes. The exemplar product copies the design of the packaging for the original STRIPHAIR THE GENTLE GROOMER product for horses [PX 342] but appears to be of inferior quality designed to imitate the original.

10.     Amy McPeak of Edison testified next. Edison is an IP enforcement company based in Austin, Texas. Edison provided infringement and counterfeiting monitoring services to Betty's Best. Edison collected the evidence of counterfeiting by the 64 Defendants and the other defendants named in this case. Ms. McPeak explained Edison's procedures to document intellectual property violations found online in general and in this case in particular.

11.     For each of the 64 Defendants, Ms. McPeak testified that Edison obtained screenshots showing the 64 Defendants' use of Betty's Best's intellectual property online at the 64 Defendants' internet websites where they offered for sale and sold the accused products that violated Plaintiff's intellectual property rights. The screenshots were admitted into evidence. [PX33–PX96]. The Plaintiff introduced (through Ms. McPeak) a document that Edison used as a guide showing the Plaintiff's different registered copyrights. [PX5]. Using this document admitted as PX5, and the STRIPHAIR and THE GENTLE GROOMER trademark registrations and the Plaintiff's design patents, Edison identified violations of Betty's Best's intellectual property rights by the 64 Defendants and recorded those on a chart showing the 64 Defendants' infringements admitted as PX265.

12.     Ms. McPeak also testified that Edison made test purchases from certain of the 64 Defendants on Plaintiff's behalf and that those test purchases were shipped to Florida. Photographs

of the test purchases, packaging and shipping envelopes for the test purchases were admitted into evidence. [PX37, PX43, PX44, PX54, PX55, PX58, PX59, PX62, PX65, PX68, PX69, PX71, PX72, PX78, PX79, and PX96].  The Court examined all the test purchase photographs and was able to see that they were all shipped to an address in the Southern District of Florida.

13.    Ms. McPeak testified about sales information received from PayPal in response to the TRO entered in this action. Ms. McPeak explained that the sales information showed sales by the 64 Defendants and that Edison is experienced in analyzing this data. A chart showing the sales by some of the 64 Defendants was filtered out and presented in a chart that was introduced into evidence. [PX267]. The sales chart reflects over $1.7 Million in sales to Florida purchasers by the 64 Defendants associated with 10 PayPal accounts. [*Id.*]. The Court observed that the chart of entities filed by the 64 Defendants [ECF 121-1] reflects that multiple of the 64 Defendants use the same PayPal accounts.

14.    Plaintiff called Sunday Jacobs, the Chief Operating Officer of Betty's Best. Ms. Jacobs' responsibilities include financial matters for the company. Ms. Jacobs testified that the company has been damaged by the 64 Defendants' sales of accused products in numerous ways, some quantifiable and some unquantifiable. The Court received financial statements for the Plaintiff dating back to 2018 into evidence, as well as a chart prepared by Ms. Jacobs purporting to show the financial harm that Plaintiff has suffered from the counterfeiting activity as compared with what Ms. Jacobs testified the company's results should have been without the interference of alleged counterfeiters like the 64 Defendants. [PX335].

15.    Ms. Jacobs testified to the 64 Defendants' use of Plaintiff's registered copyrights and trademarks in Facebook advertising. The Court admitted into evidence screenshots of Facebook advertisements collected by Ms. Jacobs from the Facebook Ad library and from the

Facebook Brand Registry tool. [PX97–PX178]. The screenshots collected in PX97–PX178 show that the 64 Defendants used Plaintiff's intellectual property in the 64 Defendants' Facebook ads for the accused products.

16.     Ms. Jacobs testified that she reported the 64 Defendants' use of Betty's Best's intellectual property to Facebook in reports that were introduced into evidence. [PX179–PX224]. The reports introduced into evidence as PX179–PX224 documented the reporting by Plaintiff of the use of Plaintiff's intellectual property by the 64 Defendants. The Plaintiff also maintained an extensive spreadsheet of the 64 Defendants' use of Plaintiff's intellectual property in connection with the 64 Defendants' advertising and sale of the accused products and the portion of that spreadsheet that listed the 64 Defendants' Facebook advertisements was admitted into evidence. [PX337]. Ms. Jacobs also created comparisons showing the 64 Defendants' Facebook advertisements alongside the Plaintiff's intellectual property including the Plaintiff's copyrighted photographs and videos, and these comparisons were introduced into evidence for demonstrative purposes. [PX225–PX264].

17.     As previously noted, the 64 Defendants offered no evidence at the hearing on the Motion. Furthermore, counsel for the 64 Defendants indicated that the evidence previously offered by declarations filed at ECF Nos. 121-2–121-7 that the 64 Defendants' sales of accused products were only $42,144 was inaccurate.

## II.     CONCLUSIONS OF LAW

To obtain a preliminary injunction, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4)

that the entry of the relief would serve the public interest." *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005).

### A. Likelihood of Success on the Merits

The Court finds that Plaintiff has demonstrated a likelihood of success on the merits of its claims that the 64 Defendants infringed on Plaintiff's trademarks, copyrights and patents in connection with the sale of accused products and the advertising of those accused products on Facebook. The Plaintiff's trademarks, copyrights and design patents are stipulated to be valid and subsisting, and Ms. Owen's testimony confirms that this intellectual property is original to Plaintiff, created by Plaintiff, and Plaintiff's valuable property.

The Plaintiff's witness Ms. McPeak testified that she examined the 64 Defendants' websites and that those websites all used Plaintiff's intellectual property in connection with the sale of accused products, and that the accused products depicted on the website violated Plaintiff's intellectual property. Ms. McPeak testified that all 64 Defendants advertised the sale of the accused products into Florida, and that test purchases were made from the 64 Defendants that were sold and shipped to Florida. Ms. Owen and Ms. Jacobs testified that their company was damaged by the 64 Defendants' actions, including in Florida.

Ms. Jacobs testified that the 64 Defendants used Plaintiff's intellectual property to create and disseminate Facebook advertisements promoting the sale of the accused products and that Plaintiff was harmed by this activity. Ms. Jacobs testified that she compared the 64 Defendants' Facebook advertising to the Plaintiff's intellectual property and determined that the 64 Defendants used Plaintiff's intellectual property in those advertisements.

The Court was able to view the exhibits admitted into evidence and these exhibits confirmed the testimony of the witnesses as to the validity of Plaintiff's intellectual property and

the infringement of that intellectual property by the 64 Defendants. Therefore, the Court determines that the Plaintiff has demonstrated a likelihood of success on the merits of its trademark, copyright, and design patent infringement claims and its other claims for false advertising and unfair competition.

### B.  Irreparable Injury

The Court also finds that the Plaintiff has demonstrated that it will suffer irreparable injury if the preliminary injunction is not granted. Grounds for showing irreparable injury include "'loss of control of reputation, loss of trade, and loss of goodwill.'" *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) (quoting *Pappan Enters, Inc. v. Hardee's Food Sys., Inc*., 143 F.3d 800, 805 (3d Cir. 1998)). Irreparable harm is at its peak when the victim is unable to control the nature and quality of the infringer's goods. *Id.* at 190–91.

Both Ms. Owen and Ms. Jacobs testified to harm caused to Betty's Best by the 64 Defendants' actions that cannot be quantified or compensated by money. Ms. Owen and Ms. Jacobs testified that the company's brand and value have diminished, that their Facebook advertising is no longer effective, that customers and potential customers have been alienated, and that their business has suffered unquantifiable harms. The Plaintiff also presented testimony and evidence that indicates its reputation, and its goodwill as a manufacturer and distributor of quality products has been impacted negatively. The Court was able to observe from the exhibits in evidence that Betty's Best is unable to control the nature and quality of the goods being sold by the 64 Defendants. The Court determines that the Plaintiff will suffer irreparable injury if the preliminary injunction is not granted.

### C.  Balancing of Harms

The Court determines that the balance of harms weighs in favor of issuing an injunction. In determining this factor, the Court must decide whether the weight of Plaintiff's financial harm and nonmonetary harm to its goodwill and reputation "outweighs Defendants' losses arising from their inability to use [Plaintiff's intellectual property] until a decision on the merits is reached." *7-Eleven, Inc. v. Kapoor Bros. Inc.*, 977 F. Supp. 2d 1211, 1227 (M.D. Fla. 2013) (citing *Davidoff & CIE, S.A. v. PLD Int'l Corp.,* 263 F.3d 1297, 1304 (11th Cir. 2001)). A party does not suffer legitimate harm when the issuance of a preliminary injunction would only prevent a party from using intellectual property which they are not entitled to use. *Clayton v. Howard Johnson Franchise Sys., Inc.,* 730 F. Supp. 1553, 1561–62 (M.D. Fla. 1988).

Plaintiff has adequately demonstrated the harm it has suffered and will continue to suffer if the defendants are permitted to advertise and sell the accused products. Furthermore, the 64 Defendants have conceded that they have stopped selling and will not sell the accused products anymore. Therefore, the balance of harms weighs in favor of an injunction.

### D. Public Interest

The public interest weighs in favor of issuing a preliminary injunction. The 64 Defendants made no arguments to the contrary. Whether the right is trademark, copyright, patent, or the related claims of unfair competition or false advertising, there is no public interest in allowing the 64 Defendants to continue to advertise and sell the accused products using the Plaintiff's intellectual property.

### E. Personal Jurisdiction

To obtain injunctive relief, the Plaintiff must first demonstrate "at least reasonable probability of ultimate success on the question of jurisdiction." *Majd-Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901, 902 (11th Cir. 1984). In their Opposition to the Motion for Preliminary

Injunction, the 64 Defendants argue that the Court lacks personal jurisdiction over these defendants and submitted evidence of "each and every sale it made[,]" indicating that "most websites have zero sales to Florida." [ECF No. 121 at 3]. Although the Court considered this evidence at the TRO stage, Defendants' counsel indicated reliability issues with this data at the November 13, 2023 hearing, stating that sales may in fact be higher than $42,144.

Plaintiff relies on specific personal jurisdiction pursuant to § 48.193.(1)(a)(2), Fla. Stat., which authorizes jurisdiction over "[a]ny person . . . who personally or through an agent . . . [commits] a tortious act within this state." *Id*. Violations of copyright and trademark rights qualify as tortious acts under Florida's long-arm statute. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013) (trademark infringement claims qualify as tortious acts); *Precision Software Servs., Inc. v. Fortune Fin. Sys., Inc.,* Case No. 98-136-CIV-FTM-17D, 1998 U.S. Dist. LEXIS 22068, at *11 (M.D. Fla. Oct. 13, 1998) (citing *Cable/Home Commun. Corp. v. Network Prods.,* 902 F.2d 829, 856 (11th Cir. 1990) (copyright infringement is a tort)).

The evidence presented at the hearing satisfies Plaintiff's burden to demonstrate a reasonable probability of ultimate success on the question of personal jurisdiction. Plaintiff demonstrated that the 64 Defendants offered the accused products for sale to Florida residents in the screenshots of their websites. [PX33–PX96]. In fact, the PayPal sales alone show sales totaling over $1.7 million. [PX 267].

Plaintiff also demonstrated that the 64 Defendants shipped the accused products to Florida when plaintiff made test purchases. [PX37, PX43, PX44, PX54, PX55, PX58, PX59, PX62, PX65, PX68, PX69, PX71, PX72, PX78, PX79, and PX96]. The 64 Defendants argue that sales to test purchasers do not suffice to establish personal jurisdiction, citing *Pado, Inc. v. Wieder & Friedman Enter. Inc.*, No. CV2004278CJCPVCX, 2020 WL 13368480, at *3 (C.D. Cal. July 9, 2020), where

the Court stated that "the sales and letters to Plaintiff's two 'test purchasers' are not sufficient to support personal jurisdiction over Defendants in California because 'the plaintiff cannot be the only link between the defendant and the forum.'") (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). But even if test purchases are not enough to establish personal jurisdiction, the evidence presented by Plaintiff at the hearing demonstrates that far more than a few test purchases were made in the state of Florida. As such, the evidence presented sufficiently demonstrated that the plaintiff's facts are sufficient to establish specific personal jurisdiction over the 64 Defendants under § 48.193.(1)(a)(2), Fla. Stat. *See Dohler S.A. v. Guru*, No. 16-23137-CIV, 2017 WL 4621098, at *5 (S.D. Fla. Oct. 16, 2017) (finding allegations that Defendants sold thirty-two counterfeit products to Florida consumers by virtue of a website accessible in Florida sufficient to satisfy Florida's Long-Arm Statute).

### F. Service of Process

The 64 Defendants also argue that they were never validly serviced. [ECF No. 121 at 11]. *See Night Owl SP, LLC v. Dongguan Auhua Elecs. Co.*, No. 219CV109FTM38UAM, 2019 WL 5084162, at *1–2 (M.D. Fla. Mar. 15, 2019) (stating that e-mail deliveries to defendants in China "are improper methods of service.. . ."); *Smart Study Co. v. Acuteye-Us*, 620 F. Supp. 3d 1382, 1389–1393 (S.D.N.Y. July 21, 2022) (holding that "because the defendants are located in China, a party to the Convention, the Hague Convention applies" and "service via email on litigants located in China is not permitted by the Hague Convention."). Plaintiff counters that a "small minority" of districts have adopted Defendants' reading of the Hague Convention. [ECF No. 130 at 8].

Whether the Hague Convention prohibits courts from authorizing service of process via e-mail is an issue of first impression for the Eleventh Circuit. Indeed, "district courts around the

country are deeply split." *Duong v. DDG BIM Services LLC*, 823CV01551KKMJSS, 2023 WL 7209982, at *3 (M.D. Fla. Nov. 2, 2023). But the Undersigned has addressed this matter in the Order Authorizing Alternate Service of Process [ECF No. 21], and courts in this district agree with the interpretation of the Hague Convention that permits service of process via e-mail and other electronic means to parties located in China and other signatory nations. *See Duenas v. Individuals, P'ships, & Unincorporated Ass'ns Identified on Sechedule A*, No. 23-21365-CIV-ALTONAGA, 2023 U.S. Dist. LEXIS 93083, at *3 (S.D. Fla. Apr. 14, 2023) (holding that e-mail or internet service to Defendants located in China would not violate an international agreement, and a "court acting under Rule 4(f)(3) therefore remains free to order alternative means of service where a signatory nation has not expressly objected to those means."); *Cf. Stat Med. Devices, Inc. v. HTL-Strefa, Inc.*, No. 15-20590-Civ, 2015 U.S. Dist. LEXIS 122000, 2015 WL 5320947, at *3 (S.D. Fla. Sept. 14, 2015) (stating that "an objection to service through 'postal channels' does not equate to an express objection to service via electronic mail" and that "many federal courts have permitted service by electronic mail" (citations omitted)); *Chanel, Inc. v. Civel.Shop*, No. 23-cv-61106-BLOOM, 2023 U.S. Dist. LEXIS 156837, at *3 (S.D. Fla. June 13, 2023) (holding that service by e-mail or internet communication to defendants located in China does not violate an international agreement).

While it is worth noting that this issue will be addressed in the Order on the Motion to Dismiss (which is currently pending before the Court), at the preliminary injunction stage, the Undersigned finds that the 64 Defendants were validly served in accordance with Fed. R. Civ. P. 4(f)(3).

**G. Asset Freeze**

The 64 Defendants argued at the hearing, in their Opposition, and in their Summary of Issues brief, that the asset freeze that this Court reduced from over $21 Million to $2 Million should be further reduced. The 64 Defendants argued that Plaintiff cannot demonstrate the amount of sales made by the 64 Defendants to justify the amount of the asset freeze.

Plaintiff argues that its burden "for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains [is required] . . . Exactitude is not a requirement." *Acoustics v. Se7Ven Sounds Music, Inc.,* No. 8:22-cv-2823-MSS-AAS, 2023 U.S. Dist. LEXIS 67070 (M.D. Fla. Mar. 28, 2023). Plaintiff further argues that this is based on the fact that it is often impossible to calculate disgorgement with precision and exactitude. *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 171 (2d Cir. 1980). Therefore, it states that any risk of uncertainty about exact amount received falls on the wrongdoer whose illegal conduct created the uncertainty. See *SEC v. Inorganic Recycling Corp.*, 2002 WL 1968341 (S.D.N.Y.2002) (stating that the risk of uncertainty falls on defendants since fraudsters rarely keep accurate records of the proceeds of their crimes); *S.E.C. v. Lauer*, 445 F. Supp. 2d 1362, 1370 (S.D. Fla. 2006). [ECF No. 130 at 9–10].

The 64 Defendants counter that the asset freeze "must be limited to an amount equivalent to an equitable remedy of disgorgement of profits." [ECF No. 185 at 7]. In other words, they argue that the equitable remedy for an injunction cannot be "tied to money damages, such as statutory damages or other calculations of damages[,]" and evidence related to theories of damages should not be considered by the Court. [*Id.*]. Of note, the 64 Defendants cite to *Awareness Ave. Jewelry LLC v. P'ship*, a Middle District of Florida case where the court entered an order modifying the asset restraint entered on a preliminary injunction. No. 8:23-cv-2-TPB-AAS, 2023 U.S. Dist. LEXIS 88241 (M.D. Fla. May 19, 2023). There, the defendants presented evidence of sales, and

Plaintiff presented no contrary evidence. [*Id.* at *2]. However, that is not the case here. Betty's Best presented documentary and testimonial evidence of their past sales revenue and profits at the hearing and projections of profits lost. The 64 Defendants presented none.

Should the 64 Defendants seek to reduce the asset freeze, they may file a motion seeking a modification, attaching reliable and conclusive evidence of sales. At present, the only evidence before the Undersigned is the 64 Defendants' previous proffered total amount of their worldwide sales of the relevant products—a figure that this Court relied upon in connection with the reduction of the asset restraint from over $21 million to $2 million—which it now admits was not only inaccurate, but could be higher. The 64 Defendants' failure to offer any evidence whatsoever showing their sales of accused products is fatal to their attempt to reduce the asset restraint further. Therefore, the asset restraint will be maintained.

### III.    CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Plaintiff's Motion [ECF No. 17] be **GRANTED**, and a Temporary Restraining be ordered against the 64 Defendants as follows:

1.  Each of the 64 Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with the 64 Defendants having notice of this Order are hereby temporarily restrained as follows:

    a.  From manufacturing, importing, advertising, promoting, offering to sell, selling, distributing, or transferring any products bearing or using one or more of the BETTY'S BEST Marks, or any confusingly similar trademarks, other than those actually manufactured or distributed by Plaintiff; and

    b.  From secreting, concealing, destroying, selling off, transferring, or

otherwise disposing of: (i) any products, not manufactured or distributed by Plaintiff, bearing and/or using one or more of the BETTY'S BEST Marks, or any confusingly similar trademarks; or (ii) any evidence relating to the manufacture, importation, sale, offer for sale, distribution, or transfer of any products bearing and/or using one or more of the BETTY'S BEST Marks, or any confusingly similar trademarks; or (iii) any assets or other financial accounts subject to this Order, including inventory assets, in the actual or constructive possession of, or owned, controlled, or held by, or subject to access by, any Defendant, including, but not limited to, any assets held by or on behalf of any Defendant;

    c.  From copying, displaying, distributing, or creating derivative works of Plaintiff's Copyrighted Works; and

    d.  From making, using, selling, importing and/or offering to sell products that practice the Plaintiff's Design Patent.

2. Each of the 64 Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with the 64 Defendants having notice of this Order shall immediately discontinue, until further Order of this Court, the use of one or more of the BETTY'S BEST Marks, or any confusingly similar trademarks, the Copyrighted Works, and the Plaintiff's Design Patent, on or in connection with all Internet based e-commerce stores owned and operated, or controlled by them.

3. Each of the 64 Defendants, their officers, directors, employees, agents, subsidiaries, distributors, and all persons in active concert or participation with the 64

Defendants having notice of this Order shall immediately discontinue, until further Order of this Court, the use of one or more of the BETTY'S BEST Marks, or any confusingly similar trademarks, within domain name extensions, metatags or other markers within website source code, from use on any webpage (including as the title of any web page), from any advertising links to other websites, from search engines' databases or cache memory, and any other form of use of such terms that are visible to a computer user or serves to direct computer searches to Internet based e-commerce stores registered, owned, or operated by the 64 Defendants.

4. Each of the 64 Defendants shall not transfer ownership of their websites during the pendency of this action, or until further order of the Court.

5. Each of the 64 Defendants shall continue to preserve copies of all computer files relating to the use of any of the 64 Defendants' websites and shall take all steps necessary to retrieve computer files relating to the use of the 64 Defendants' websites that may have been deleted before the entry of this Order.

6. Plaintiff shall maintain the bond posted in the amount of Five Hundred Thousand Dollars and Zero Cents ($500,000.00) at ECF No. 180 as payment of damages to which the 64 Defendants may be entitled for a wrongful injunction or restraint, during the pendency of this action, or until further Order of the Court.

7. A retention of the 64 Defendants' assets in the total amount of $2,000,000.00 restrained shall be continued to be maintained as deposited into the attorney trust account of DGW Kramer LLP and held there during the pendency of this matter.

## IV.    OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(a), the 64 Defendants have THREE (3) days from the date of this Report and Recommendation to serve and file written objections, if any, with the District Judge. *See generally Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.,* 896 F.2d 507 (11th Cir. 1990). Failure to timely file objections will bar a de novo determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4,* 977 F.3d 1185, 1191–92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 17th day of November, 2023.

_____
LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc:     **U.S. District Judge Kathleen M. Williams**; and

        **All Counsel of Record**

21